**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ABBVIE INC. and ABBVIE BIOTECHNOLOGY LTD, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 1:21-cv-1530 |
| ALVOTECH HF., | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiffs AbbVie Inc. and AbbVie Biotechnology Ltd (collectively, "AbbVie" or "Plaintiffs") allege as follows against Defendant Alvotech hf. ("Alvotech" or "Defendant").

## INTRODUCTION

1.      AbbVie Inc. is an American company headquartered in this District in North Chicago, Illinois.  AbbVie has expended vast resources over decades developing HUMIRA® (adalimumab), a complex biologic drug that is approved to treat eleven diseases and has helped more than one million patients.  In 2020, AbbVie invested more than $5 billion in R&D.  AbbVie's hard work, ingenuity, research, and persistent development of HUMIRA®, including work under the supervision of AbbVie's leadership in North Chicago, Illinois, by AbbVie scientists in a first manufacturing facility in Worcester, Massachusetts and a second facility in Puerto Rico, ultimately created a market worth billions of dollars.

2.      Biologic drug manufacturing is a complex and sensitive process that requires significant investments in time and expertise to develop and fine-tune on a commercial scale.

AbbVie, having spent the resources to develop such high volume, continual processes, carefully guards this information, sharing it with its employees only on a need-to-know basis, including in order to train them on how to perform the commercial, large scale, high quality-manufacturing processes. As discussed further below, this detailed confidential and proprietary information is distinct and of a different nature from AbbVie's inventions related to adalimumab formulations, improved manufacturing processes, and methods of treatment of debilitating diseases that have been published in AbbVie's patents related to adalimumab.

3.      Alvotech, like other biosimilar drug companies, seeks to enter the U.S. market with a copycat version of AbbVie's HUMIRA®. But Alvotech took a shortcut. Instead of investing the necessary time and resources to independently develop the manufacturing process for its biosimilar, Alvotech embarked on an unlawful plot to surreptitiously take AbbVie's confidential and proprietary trade secrets related to the confidential large scale manufacturing process for HUMIRA® in order to develop and manufacture its copycat product.

4.      Alvotech's plan to steal AbbVie's technologies started with a plot to target AbbVie from the inside, through its personnel. While he was still employed by AbbVie, Alvotech recruited and hired Rongzan Ho, a team leader of upstream manufacturing for HUMIRA® who had substantial access to AbbVie's proprietary technologies. Alvotech tasked the former HUMIRA® team leader with developing and overseeing manufacturing for its copycat version of HUMIRA®.

5.      Just before leaving AbbVie, and for the benefit of and at the direction of Alvotech, Mr. Ho transmitted confidential and proprietary AbbVie trade secret information to his personal email account for use by Alvotech in violation of his obligations to AbbVie. Mr. Ho attempted to email this confidential and proprietary trade secret information to himself *three* times and, after AbbVie's security systems blocked his email titled "Useful Information" the first two times, Mr.

Ho deceptively renamed it "Keep in touch (AbbVie)" and overrode the security warning notice to finally succeed in emailing AbbVie's trade secrets to his personal email account on the third try. Alvotech's recruit, and by extension Alvotech, unlawfully took AbbVie's confidential trade secret materials to Alvotech for use in his work there, including by using information taken from AbbVie to develop and implement the manufacturing of a knockoff version of the exact same drug that he was responsible for at AbbVie.

6.     AbbVie did not know nor could it have reasonably discovered Alvotech's plan to steal AbbVie's confidential and proprietary trade secrets related to the commercial manufacturing process for HUMIRA® at that time.  Alvotech, including through its employee, concealed its unlawful acquisition and use of AbbVie's confidential and proprietary trade secrets.  First, in connection with and within the scope of his imminent employment at Alvotech, Mr. Ho transmitted confidential and proprietary AbbVie trade secret information to his personal email account. Second, to cover his tracks and dissuade AbbVie from looking closely at his departure, Mr. Ho affirmatively misrepresented that he had "expunged all AbbVie information from any computer, word processor, external storage device, in email or cloud storage or other device belonging to me or under my control."  He also declared that he had "returned all information . . . in [his] possession . . . relating or belonging to AbbVie and/or its affiliates . . . including but not limited to confidential, sensitive and/or proprietary information such as . . . development know-how, trade secrets, techniques, processes, [and] procedures . . . information and documentation . . . ."  March 2, 2018 Rongzan Ho Decl..  Third, Mr. Ho concealed that he was going to work at Alvotech to help it develop and oversee the manufacture of a copycat of the drug he was responsible for at AbbVie and made misleading statements that he was leaving AbbVie for career development

3

reasons, "mainly to learn single-use bio reactors and other new technologies." February 14, 2018 Rongzan Ho Exit Interview Form.

7.      On February 24, 2021, AbbVie wrote to Alvotech's CEO, Mark Levick, regarding its belief that Alvotech had embarked on an unlawful plot to surreptitiously take AbbVie's confidential and proprietary trade secrets related to the manufacturing process for HUMIRA® to develop and manufacture its competing biosimilar product. AbbVie asked Alvotech to address this belief, particularly given the timing of Alvotech's hiring of Mr. Ho, the timing of his tenure with Alvotech, and the timing of Alvotech's announcements regarding its biosimilar to AbbVie's HUMIRA®. In its March 3, 2021 response, Alvotech did not deny that Mr. Ho worked on a biosimilar to HUMIRA® while employed at Alvotech. Alvotech also did not deny that it deployed Mr. Ho in the exact same role he performed at AbbVie and tasked him with developing and overseeing manufacturing for a biosimilar of the exact same drug that he was responsible for at AbbVie, AVT02, a high-concentration HUMIRA® biosimilar, again in violation of his obligations to AbbVie.[1] And while Alvotech stated it would investigate AbbVie's claims, it never presented the results of any investigation, let alone any exculpatory evidence or even a denial that a theft had occurred. Nor has Alvotech taken any steps to remediate its willful and malicious conduct.

8.      Further, Alvotech not only recruited AbbVie's employee, Mr. Ho, but has continued to recruit AbbVie employees with intimate knowledge of the HUMIRA® manufacturing process. At least two additional AbbVie employees have been recruited by Alvotech and hired in May 2020. Alvotech also attempted to recruit, without success, one or more additional AbbVie employees through at least one recruiter, specifically inquiring about a position to work on Alvotech's biosimilar to AbbVie's HUMIRA® as part of the job description.

---

[1] March 3, 2021 Correspondence from Alvotech counsel to AbbVie counsel (copy on file).

9.     Alvotech's willful and malicious misappropriation of AbbVie's trade secrets leaves AbbVie no choice but to file this lawsuit seeking injunctive relief and recovery of damages for the harm that has been caused by Alvotech's illegal conduct.   Alvotech's conduct threatens uncontrolled and irreparable dissemination of AbbVie's trade secrets around the world, as Alvotech already built a biologics manufacturing facility in Iceland and recently announced a joint venture to build a new biologics manufacturing facility in China.   Unless enjoined, Alvotech's illegal actions will serve as a roadmap to use AbbVie's trade secrets for both Alvotech and other companies that have not adequately invested in their own independent research and development.

**THE PARTIES**

10.     Plaintiff AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064.   AbbVie Inc. is engaged in the development, sale, and distribution of a broad range of pharmaceutical and biologic drugs, including HUMIRA®.

11.     Plaintiff AbbVie Biotechnology Ltd ("ABL") is a corporation organized and existing under the laws of Bermuda, with a place of business at Clarendon House, 2 Church Street, Hamilton HM1l, Bermuda and a manufacturing facility in Barceloneta, Puerto Rico.   Through intermediate organizations, Plaintiff AbbVie Inc. owns Plaintiff ABL.

12.     Defendant Alvotech hf. is a company organized and existing under the laws of Iceland, with its principal place of business at Saemundargata 15-19, 101 Reykjavik, Iceland.

**JURISDICTION AND VENUE**

13.     This action arises under the Defend Trade Secrets Act of 2019 ("DTSA"), 18 U.S.C. §§ 1836(b)-(c).   This action also arises under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*.

5

14.     This Court has subject matter jurisdiction over the federal claims asserted in this Complaint under 28 U.S.C. § 1331 because this action arises under the DTSA.  Further, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Illinois trade secrets claim because it is so closely related to AbbVie's claim for misappropriation of trade secrets under the DTSA that it forms part of the same case or controversy.

15.     In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, excluding interest and costs, and the parties are citizens of different states and/or foreign states.

16.     This Court has personal jurisdiction over Alvotech.  Alvotech has purposefully directed activities at residents of Illinois and this District, and this action arises out of and relates to those activities.  For example, Alvotech, at least through Mr. Ho, knowingly misappropriated trade secrets owned by AbbVie.  AbbVie Inc. is headquartered in Illinois and this District, and these trade secrets originated in the United States, including being developed under the leadership of AbbVie's management in Illinois in the first AbbVie manufacturing facility in Worcester, Massachusetts and a second AbbVie facility in Puerto Rico.  During Mr. Ho's employment, AbbVie's email server for its Singapore facility and the back-up server for the Singapore file-share server that housed the Excel spreadsheets containing AbbVie's confidential and proprietary information and trade secrets that Mr. Ho misappropriated were both hosted in Alpharetta, Georgia, further confirming the trade secrets were misappropriated from the United States. Moreover, Alvotech has taken the costly, significant step of submitting an abbreviated Biologics Licensing Application ("aBLA") to the United States Food and Drug Administration ("FDA") seeking approval to engage in the commercial use, sale, and/or distribution of its competing biosimilar product throughout the United States, including in Illinois.  Furthermore, Alvotech sent

its aBLA to AbbVie Inc. at its corporate headquarters in North Chicago, Illinois. Alvotech's competing biosimilar product is derived from, utilizes, contains, embodies, or was developed, in whole or in part, with the benefit or use of AbbVie's trade secret information. Alvotech's aBLA submission constitutes a formal act that reliably indicates plans to engage, directly or indirectly, in marketing of its competing biosimilar product throughout the United States, including in Illinois. If Alvotech's aBLA is approved, its competing biosimilar product will be sold in, directed to, and prescribed by physicians practicing in Illinois and/or administered to patients in Illinois. Further, Alvotech's trade secret misappropriation has led to foreseeable harm and injury to AbbVie throughout the United States, especially in Illinois where AbbVie Inc. resides. As such, Alvotech has established sufficient minimum contacts with this District, such that it should reasonably and fairly anticipate being called into court in this District.

17.     Venue is proper in this federal District pursuant to 28 U.S.C. § 1391. Alvotech is incorporated in Iceland and may be sued in any judicial district in the United States in which Alvotech is subject to personal jurisdiction. Additionally, venue is proper because AbbVie Inc. resides in this District, has made significant investments of both equipment and engineering talent, manages the trade secret technologies from its headquarters in this District, sells products including HUMIRA® in this District, and has suffered harm in this District.

## ADDITIONAL FACTUAL ALLEGATIONS

### A.     AbbVie Embarked on Decades of Research, Investment, and Innovation

18.     HUMIRA® belongs to a category of drugs known as biologics. Biologics are complex proteins manufactured in living cells rather than by chemical synthesis. These are critically important drugs that are difficult to develop, manufacture, formulate, and administer. Within the category of biologics, HUMIRA® is unique because it was the first fully-human antibody approved by the FDA. In bringing HUMIRA® from the laboratory to patients in the

United States and various countries throughout the world, AbbVie operated in uncharted territory. In 1996, AbbVie invented the adalimumab antibody, the active ingredient in HUMIRA®. But that was only the first step. Since then, AbbVie has embarked on over two decades of research, investment, and innovation, including in particular in the United States and in this District.

19.     As part of its commitment to improve patients' lives, AbbVie has dedicated substantial resources to an extensive clinical trial program. AbbVie's clinical research on HUMIRA® includes over 100 clinical trials, many of which were conducted at sites in the United States including sites in this District, and resulted in FDA approval for the treatment of eleven indications, including rheumatoid arthritis, juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, Crohn's disease (adult and pediatric), ulcerative colitis (adult and pediatric), plaque psoriasis, hidradenitis suppurativa, and uveitis. To date, over 1.1 million patients have benefited from AbbVie's pioneering work on HUMIRA®.

20.     AbbVie has also spent many years developing its complex manufacturing processes for adalimumab and HUMIRA®, including in the United States. As discussed above, unlike traditional drugs, HUMIRA® is a complex biologic manufactured in living organisms. The manufacturing process for such a complex biologic is a sophisticated, expensive, and highly specialized process. As discussed below, the manufacturing process for HUMIRA® may be divided into three parts: (1) upstream manufacturing, (2) downstream manufacturing, and (3) formulation.

21.     The upstream manufacturing process for HUMIRA® begins by establishing a bank of mammalian cells engineered to produce a specific protein, adalimumab. Once the cell bank has been established, cells from the bank are removed, thawed, and cultured in an environment that is precisely controlled to encourage the growth of cells (the expansion stage) and ultimately the

production of adalimumab (the production stage). The production is then harvested to remove cells and cell debris, resulting in an adalimumab-containing solution that may enter the downstream manufacturing process.

22. During the downstream manufacturing process, the adalimumab-containing solution is processed to reduce impurities. The purified adalimumab-containing solution may then be formulated into HUMIRA®. Before AbbVie's launch of HUMIRA®, patients prescribed anti-TNFα biologics had to go to the hospital or infusion clinic to receive their medicine intravenously (e.g., REMICADE®) or mix batches of medicine at home (which was difficult for patients with inflamed joints) and inject themselves twice a week (e.g., ENBREL®). But AbbVie invested in and created a liquid formulation of the HUMIRA® antibody suitable for subcutaneous administration. As a result of AbbVie's innovation, patients were able, for the first time, to inject their medicine at home, using pre-filled syringes, and take fewer injections. The added convenience and precision has improved patients' lives and increased compliance without sacrificing HUMIRA®'s outstanding efficacy.

23. AbbVie also invested significant resources in developing a high concentration, citrate-free formulation of HUMIRA® including in the United States. This formulation works like original HUMIRA® but requires less liquid to inject and causes less pain following injection, both of which are advantages over the original HUMIRA® formulation. AbbVie's considerable investment in developing and offering different formulations and concentrations of adalimumab provides substantial benefits to patients.

24. AbbVie has been granted patents on aspects of its manufacturing process, but like every manufacturer in the industry, AbbVie maintains considerable details of its large-scale, continual manufacturing process as secrets. These details include, for example, AbbVie's day-to-

day procedures for monitoring, adjusting, and controlling numerous process parameters, including plant equipment set-up and operation. They also include AbbVie's day-to-day procedures for monitoring cell count, viable cell density, and indicators of contamination, as well as AbbVie's day-to-day procedures for measuring, preparing, monitoring, and controlling process components and parameters. The detailed aspects of AbbVie's manufacturing process, including these parameters and others, ensure a high quality, consistent, and efficient manufacturing process. These processes also reflect years of trial-and-error, and set out what to do in manufacturing adalimumab.

**Development of AbbVie's Manufacturing Process for HUMIRA®**

25. AbbVie's first manufacturing facility for HUMIRA® was what is now AbbVie Bioresearch Center, Inc.'s ("ABC") facility in Worcester, Massachusetts. Under the leadership of AbbVie management in North Chicago, Illinois, AbbVie's scientists at ABC developed AbbVie's first commercial-scale manufacturing process. When AbbVie outgrew its Worcester facility, it built a new ABL manufacturing facility in Barceloneta, Puerto Rico. Based on AbbVie's experience and continued investment in research and development, ABC and ABL continued to improve upon the manufacturing process, focusing on quality, consistency, and efficiency. The sum of this know-how was embodied in ABL's Puerto Rico facility, which was the first AbbVie facility to manufacture AbbVie's high concentration, citrate-free formulation of HUMIRA®.

**AbbVie Trade Secrets**

26. AbbVie's manufacturing process for HUMIRA® is the product of meticulous, time-consuming, and expensive research. While aspects of the process have been described in patents and patent applications, AbbVie's more than two decades of experience and investment in its processes have generated substantial know-how for AbbVie in the form of confidential and

proprietary trade secrets. The manufacturing process for HUMIRA® becomes increasingly complex when it is run continually at large scale, and AbbVie's confidential and proprietary trade secrets include the technical know-how required to run a high quality, efficient, and consistent commercial-scale manufacturing process for adalimumab, as well as protocols to avoid many pitfalls that would otherwise be encountered.

27.     The highly confidential documents and materials misappropriated by Alvotech, which include very detailed technical requirements and specifications regarding AbbVie's manufacturing processes for HUMIRA®, are included in "AbbVie's Trade Secrets." These confidential materials include shift notes, stock lists, training statuses, weekly checklists, and detailed process steps for the upstream HUMIRA® manufacturing process.

28.     AbbVie's Trade Secrets also include the following information, both alone and in combination:

    a.      the materials, equipment (including care and maintenance), step-by-step instructions, control parameters, expected yields, and testing and sampling techniques for the HUMIRA® manufacturing process;

    b.      training programs to ensure competency of required personnel, coordinate management of resources and equipment, and for commissioning and qualification of new equipment and new areas;

    c.      detailed descriptions of know-how and experience regarding the trial, errors to avoid, development, and engineering process runs required to bring a new facility online; and

    d.      detailed descriptions of knowledge and understanding of ABL's manufacturing facilities in Barceloneta, Puerto Rico, and Singapore, including their design and operation.

29.     Such information is critically important because the output of one step in the manufacturing process is the input to the next step. Over its decades of experience manufacturing HUMIRA®, AbbVie has developed sophisticated protocols, procedures, timelines, and checklists to ensure achievement of an efficient and consistent upstream manufacturing process. Such

information is documented, for example, in voluminous multi-sheet Excel spreadsheets amassing hundreds of rows and columns and hundreds of pages of information. AbbVie even has documents providing day-by-day manufacturing instructions for adalimumab spanning multiple months.

30.     While this information is important for efficiently maintaining existing commercial-scale operations, it is also crucial for launching commercial-scale operations in a new facility. Even with AbbVie's well-established protocols for producing adalimumab, and its substantial know-how in commercial-scale adalimumab manufacturing, it takes years to bring a new facility online. Indeed, even with an FDA-approved manufacturing process, AbbVie must manufacture various engineering and process batches in order to register a new facility with the FDA as an adalimumab manufacturing site. AbbVie also must ensure that the general operations of the facility, including room classifications, HVAC, gowning procedures, and material and personnel flows, are acceptable to the FDA.

**B.      AbbVie Protects Its Confidential and Proprietary Trade Secrets**

31.     As a leader in the biologics industry, AbbVie has expended considerable resources in R&D, which has resulted in significant confidential and proprietary trade secrets, including the AbbVie Trade Secrets. In 2020, for example, AbbVie invested more than $5 billion in R&D. As a result of its substantial investment in and decades-long dedication to innovation, AbbVie has been awarded patents covering, *inter alia*, adalimumab and HUMIRA®. But AbbVie also keeps significant aspects of its processes—especially its manufacturing processes—as trade secrets to protect their value and the significant investments AbbVie has made in their development. This confidential information derives considerable independent economic value from being not generally known outside of AbbVie.

32.     AbbVie protects its confidential and proprietary trade secrets, including the AbbVie Trade Secrets, in numerous ways, including by restricting access to confidential information only

to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements. For example, as a condition of their employment and as part of their employment agreement, AbbVie's employees sign non-disclosure agreements pursuant to which they agree, among other things, to not use or disclose AbbVie's confidential information, including trade secrets, outside of their work for AbbVie.

33. AbbVie implements various policies across its drug product development operations to limit access to trade secrets and other sensitive data to those employees who need to know the information. These policies include: marking confidential documents and materials as such where appropriate; restricting access to physical files; maintaining documents out of plain view; requiring secure passwords for, and limiting access to, computers and networks that contain trade secrets; prohibitions against discussing confidential information in common areas such as the cafeteria, lobbies, or intra-company events; and distributing information on a need-to-know basis. AbbVie additionally provides its trade secret policy statement in employee handbooks and legal education programs and conducts periodic reviews of confidentiality policies.

34. AbbVie's trade secret policies for maintaining and managing trade secrets within its drug product development organization apply to all drug product development employees in the United States and Singapore and are kept and managed from an AbbVie site in Lake County, Illinois.

35. As to significant non-public and non-patented aspects of all manufacturing processes, including the manufacturing process for HUMIRA®, AbbVie has always maintained these details as quintessential trade secrets. For example, manufacturing processes and details are routinely identified as trade secrets at training seminars for AbbVie scientists and engineers. Managers in manufacturing are responsible for maintaining and managing information regarding

AbbVie's manufacturing processes under a formal data loss prevention program. Much of the information regarding manufacturing processes—while known to specialized professionals responsible for manufacturing—is stored on non-networked servers, is subject to encryption policies, may only be accessed by those who need to know, and requires the use of two-factor authentication. Additionally, all such information is restricted from communication outside of AbbVie personnel and devices and must be returned prior to an employee leaving AbbVie.

36. AbbVie also implements policies to limit employees who may need to know trade secret information from disseminating it further. Employee obligations to protect trade secrets include, but are not limited to: prohibitions against disclosing the trade secret information externally; implementing procedures for visitors, such as signing in and out, wearing a visitor's badge, and requiring an escort; prohibitions against disclosing confidential information during new employee interviews; limiting tours of the facility; having applicants sign a confidentiality and non-disclosure agreement; prohibiting photography on AbbVie premises; prohibiting the use of non-AbbVie devices, and non-AbbVie servers and drives; designating and classifying data, documents and emails according to classification policies; and reminding departing employees of their obligation to keep AbbVie trade secrets confidential, especially with respect to a new employer. All of these measures apply to all non-public information regarding AbbVie's manufacturing process for HUMIRA®.

37. In pursuing business opportunities, AbbVie restricts disclosure of trade secret information by requiring disclosure only if absolutely necessary. If disclosure must occur, AbbVie requires a license or non-disclosure agreement, itself a confidential document, that describes the information being disclosed, states the purpose(s) for the disclosure and the permitted exclusive

use(s) of the information, and reiterates the other party's obligation to maintain the secrecy of the information.

### C. AbbVie Expanded Its Manufacturing to Singapore and Hired Mr. Ho

38. In 2014, AbbVie announced that it would build a new manufacturing facility in Singapore. AbbVie Singapore was being built to manufacture, among other things, a high-concentration (100 mg/mL) HUMIRA® dosage form according to the manufacturing process developed and implemented in the United States under the supervision of AbbVie's leadership in North Chicago, Illinois, first at ABC in Worcester and then improved by ABL in Puerto Rico, with contributions from others, including in this District.

39. Mr. Ho began working at AbbVie Singapore on March 1, 2016, shortly after the building was equipped with electricity. He was hired to work in AbbVie Singapore's Biologics Operations, which was responsible for the manufacture of the high-concentration citrate-free HUMIRA® dosage form. Mr. Ho learned, among other steps, how AbbVie performs the critical steps of cultivating the genetically engineered cells needed to make adalimumab and causing them to produce large quantities of consistent product in the context of a complex manufacturing environment. Mr. Ho was one of several Team Leaders in Biologics Operations, namely, for AbbVie's upstream manufacturing of HUMIRA®.

40. Having a prominent role as Team Leader for upstream manufacturing, Mr. Ho gained intimate knowledge of AbbVie's manufacturing process for HUMIRA® that was developed under the supervision of AbbVie's leadership in North Chicago, Illinois by ABC in Worcester and ABL in Puerto Rico, and which was developed and guarded under AbbVie's strict disclosure controls.

41. Mr. Ho learned how AbbVie prepares adalimumab. He also learned how AbbVie sets up components and process equipment; operates, monitors, and adjusts the operation of

equipment including bioreactors, scales, and analytical tools; and performs process sampling for adalimumab.

42.     Mr. Ho was involved in setting up the plant in Singapore from the ground up so also learned what approaches did not work when manufacturing adalimumab. AbbVie optimized its processes over time, constantly improving to increase efficiencies through trial-and-error and based on AbbVie's prior experiences. Mr. Ho was aware of and involved in many of these changes to AbbVie's processes from the beginning, and the processes Mr. Ho worked on and that were disclosed in the trade secret documents he stole from AbbVie reveal how to manufacture adalimumab and what errors and inefficiencies to avoid.

43.     Through his training at AbbVie, Mr. Ho was qualified to execute, and was certified to train other biotechnologists to execute, many AbbVie upstream manufacturing tasks.

44.     Further, AbbVie selected Mr. Ho as one of a handful of employees to spend several months at ABL's manufacturing facility in Puerto Rico to study the HUMIRA® manufacturing processes developed there such that they could be implemented at AbbVie Singapore. In particular, Mr. Ho trained in Puerto Rico for several months beginning on May 16, 2016. While in Puerto Rico, he was trained on the specific processes, automations, principles of manufacture, and quality systems that ABL developed for the Puerto Rico facility based on contributions from scientists throughout the United States. At the end of the training, Mr. Ho was expected to demonstrate hands-on competency with the HUMIRA® drug substance manufacturing process.

45.     Further, Mr. Ho learned and had access to highly sensitive documents describing how to coordinate commissioning and qualification activities needed to bring the manufacturing facility at AbbVie Singapore online. Such documents included, *inter alia*: documentation describing the commissioning and qualification of new equipment and new areas; AbbVie's

standard operating procedures; AbbVie's training programs; documentation describing how AbbVie conducts trial, development, and engineering process runs; and documentation describing AbbVie's process validation. These highly sensitive AbbVie documents—many of which originated in the United States, including Massachusetts and Puerto Rico—ensure that department and site metric goals are achieved through schedule adherence and quality execution. As part of his work at AbbVie, Mr. Ho helped devise training plans and coordinate the preparation of training materials for Upstream and Downstream personnel.

46.     Mr. Ho was exposed to and learned AbbVie's most highly sensitive information regarding the manufacturing of HUMIRA®, including AbbVie Trade Secrets. He not only learned and had access to documents describing AbbVie's manufacturing process for HUMIRA®, but he also learned and had access to documents describing how AbbVie operates and runs its manufacturing facilities in order to achieve an efficient and consistent continual manufacturing process for HUMIRA®. Indeed, Mr. Ho spent several months in Puerto Rico specifically for the purpose of observing and learning ABL's manufacturing process for HUMIRA®. This involves, for example: critical information about the timing of various process parameters; information about materials for laboratory operations, such as logbook monitoring, equipment maintenance, and requisition of material; and information about AbbVie's inventory of non-bill of materials laboratory consumables, including about how much is consumed per process run. Such information is crucial for running a commercial-scale manufacturing process like that developed and implemented in ABL's facility in Puerto Rico.

47.     Indeed, the know-how required to manufacture a single batch of adalimumab is vastly different than the know-how required to continually run a large-scale manufacturing process for commercial-scale production of adalimumab. Manufacturing a single batch of adalimumab

does not require nearly the same level of sophisticated protocols, procedures, timelines, and checklists required for commercial-scale production of adalimumab. And Mr. Ho not only learned and had access to documents describing AbbVie's know-how for running a continual high-quality manufacturing process for commercial-scale production of adalimumab, but also he learned and had access to documents describing AbbVie's know-how for bringing a new facility online. Even with AbbVie's decades of institutional knowledge and technical know-how, it took years and numerous experimental batch runs to bring AbbVie Singapore online.

**D.    Rongzan Ho Was Obligated to Protect the Secrecy of AbbVie's Confidential and Proprietary Trade Secrets and to Refrain from Working in an Analogous Role at a Competitor**

48.    Mr. Ho was and is obligated to preserve and protect the secrecy and confidentiality of AbbVie's information and to refrain from working in an analogous role at a competitor.

49.    Indeed, Mr. Ho entered into an employment agreement with AbbVie Singapore in which he agreed to the "Non-Disclosure of Confidential Information," including to "use all best efforts to protect the secrecy and confidentiality of Confidential Information."[2] He further agreed he would "not, during the term of employment with the Company or thereafter, use or disclose, or assist in the disclosure to others, directly or indirectly, any Confidential Information."[3] The employment agreement defines "Confidential Information" as "all discoveries, inventions, improvements and innovations, whether or not registrable, methods, processes, techniques, shop practices, formulae, compounds, compositions, organisms, computer software, equipment, research data, clinical and pharmacological data, marketing, pricing and sales information, personnel data, customer lists, financial data, plans and all other know-how, trade secrets and

---

[2] Mr. Ho Employment Contract ¶ 11 (signed February 29, 2016).
[3] *Id.*

proprietary information which are in the possession of any company within the AbbVie Group and which have not been published or disclosed to the general public."[4]

50.      As part of his employment agreement, Mr. Ho further agreed to a "Non-Compete Agreement" that he would "not, during the term of employment with the Company or for a period of one (1) year after the expiration of this contract or termination of employment with the Company, in each country in which the Company or its affiliates conducts business, engage, directly or indirectly, in any activity or employment, for the benefit of you or others, in a manner that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products."[5]  The employment agreement defines "Competing Products" as "any product, process or service that has the same or similar purpose or use as a product, process or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale or used by any company within the AbbVie Group, which is related in any way to your employment with the Company."[6]

51.      AbbVie markets and sells HUMIRA® in Iceland.

52.      On February 29, 2016, Mr. Ho executed the employment agreement, which included the "Non-Disclosure of Confidential Information" and "Non-Compete Agreement," indicating his "understanding and full acceptance of the foregoing terms and conditions."[7]

53.      Further, in connection with his resignation from AbbVie Singapore, Mr. Ho assured AbbVie Singapore that he would comply with his obligations.  In particular, on March 2, 2018,

---

[4] *Id.*
[5] *Id.* ¶ 10.
[6] *Id.*
[7] Other former employees hired away by Alvotech also executed employment contracts with AbbVie Singapore having the same provision for non-disclosure of confidential information and the same non-compete agreement.

Mr. Ho executed a declaration by which he confirmed that he returned, destroyed, or expunged all AbbVie information in his possession, custody, or control.[8]  He further confirmed that he had returned all devices and other properties belonging to AbbVie; that he had not shared, disclosed, or otherwise used any AbbVie information; and that he had not intentionally made any third party aware that he possessed AbbVie information.[9]

> ### E.      Mr. Ho Sent AbbVie's Confidential and Proprietary Trade Secrets to His Personal Email Before Departing from AbbVie Singapore

54.     Despite clear obligations to protect AbbVie's trade secrets, Mr. Ho conspired with Alvotech to steal them while intentionally concealing that theft from AbbVie.  Specifically, in his exit interview, Mr. Ho stated that his "Reason for Resignation" was for "Career Development Opportunities" "mainly to learn" "new technologies."  Contrary to Mr. Ho's misdirection, he had accepted employment at Alvotech as a senior executive involving the same responsibilities as his employment at AbbVie—complex upstream manufacturing for biologics.  Even worse, Alvotech tasked Mr. Ho with developing and overseeing the upstream manufacturing for the exact same drug that he was responsible for at AbbVie—AVT02, a high-concentration HUMIRA® biosimilar.  While still in AbbVie's employ and with full access to the AbbVie Trade Secrets, and in furtherance of his new employment, Mr. Ho executed Alvotech's unlawful scheme, as set forth herein.

55.     Prior to his departure from AbbVie Singapore, Mr. Ho intentionally overrode AbbVie's security systems in order to send AbbVie's confidential and proprietary information, including certain AbbVie Trade Secrets, from his AbbVie email (which was hosted at a data center in the United States, as explained above) to his personal Google email account.  Google stores data

---

[8] Mr. Ho Departure Declaration (signed March 2, 2018).
[9] Other former AbbVie employees hired away by Alvotech executed identical departure declarations with AbbVie Singapore.

associated with personal Google mail accounts in its data centers, including its thirteen data centers located in the United States.[10]

56.     In particular, Mr. Ho attached Excel spreadsheets containing AbbVie's confidential and proprietary information and trade secrets to an email titled, "Useful info." Mr. Ho attempted to send this email, but its transmission was blocked by AbbVie's security systems.

57.     Roughly ten minutes later, Mr. Ho again attempted to forward the "Useful info" email to his personal email account. And again, AbbVie's security systems blocked the transmission of the email.

58.     Roughly four hours later, Mr. Ho retitled the email "Keep in touch (AbbVie)" and attempted to send the email to his personal email account. As described below, this was a misleading title for the email, as the attached documents had nothing to do with "keep[ing] in touch." Rather, they were and included highly sensitive AbbVie trade secrets, which indeed would be very "useful info" for a biosimilar competitor to have, as explained below. On the third try, Mr. Ho overrode AbbVie's security warning notice and successfully transmitted the documents. As alleged herein, to conceal his theft on behalf of Alvotech, Mr. Ho subsequently signed a declaration representing that he had returned and destroyed all AbbVie confidential information, including that he "expunged all AbbVie information from any computer, word processor, external storage device, in email or cloud storage or other device belonging to me or under my control." March 2, 2018 Rongzan Ho Decl. As alleged herein, that declaration, unbeknownst to AbbVie, was false.

---

[10]     https://www.google.com/about/datacenters/locations/;
https://www.businessinsider.com/google-data-centers-store-all-your-photos-and-emails-2015-6#data-centers-basically-power-all-of-googles-services-so-they-need-to-run-24-hours-a-day-2.

59.     The attachments to this email included Excel spreadsheets containing certain of AbbVie's highly confidential and proprietary information, including AbbVie Trade Secrets, that Mr. Ho had access to during his employment at AbbVie.   These Excel spreadsheets are voluminous.  Indeed, each contains multiple sheets.  One Excel spreadsheet, for example, contains twenty-three sheets, each of which is over 250 rows, totaling over 5,700 rows of information. Another multi-sheet Excel spreadsheet contains multiple sheets with more than 100 rows of information.  And yet another multi-sheet Excel spreadsheet contains one sheet, which alone has nearly 300 columns and over 130 rows, providing day-by-day instructions and other information spanning months.

60.     These confidential files contain detailed information about AbbVie's upstream manufacturing process for HUMIRA®, which was developed over more than two decades of research in development at ABC in Worcester and ABL in Puerto Rico.  For example, the files contain information about specific cell culture process parameters and conditions.  They also provide information about the timing of various process parameters.  They include culture data (e.g., viable cell density and viability) and provide dates for seed train and production culture steps. They also provide extensive logistical information and materials for laboratory operations, such as logbook monitoring, equipment maintenance, and requisition of materials.  They also provide a detailed inventory of non-bill of materials laboratory consumables, including details about quantities consumed per process run.  Further, they provide detailed logistical information on how to continually produce adalimumab in order to establish commercial-scale adalimumab production in a new facility.  These documents reflect a portion of the knowledge Mr. Ho was exposed to during his employment, which is why AbbVie required him to sign the Non-Compete Agreement as part of his employment contract.  The one year Non-Compete Agreement reflects that even in

22

the absence of taking any such documents, a significant waiting period would be necessary such that Mr. Ho's knowledge and memory of AbbVie's confidential information could begin to fade, to decrease the likelihood he would use AbbVie Trade Secrets for a competitor's benefit, intentionally or otherwise.

61.     Mr. Ho took files containing AbbVie Trade Secrets and, unbeknownst to AbbVie, used them and the other highly confidential and proprietary AbbVie Trade Secrets he learned during his employment at AbbVie, including during his training at ABL in Puerto Rico, in his identical role at AbbVie's competitor, Alvotech.  Mr. Ho's surreptitious and considerable efforts to take AbbVie's know-how demonstrates his intention to use that know-how at Alvotech and reflects not only the value he ascribed to it as he prepared to move from one adalimumab manufacturing facility to another, but also the value that Alvotech recognized and targeted him for.

62.     After his interview at Alvotech in Iceland, Mr. Ho returned to AbbVie and downloaded documents that he thought would be "useful" information that Alvotech would want based on what he learned during his job interview.

63.     As explained below, after relocating from Singapore to Iceland, Alvotech installed Mr. Ho in the exact same role he performed at AbbVie—complex upstream manufacturing for biologics.  Even worse, Alvotech tasked Mr. Ho with developing and overseeing the upstream manufacturing for the exact same drug that he was responsible for at AbbVie—AVT02, a high-concentration adalimumab biosimilar.  Alvotech used at least Mr. Ho's extensive knowledge and background regarding AbbVie's manufacturing process, including AbbVie confidential and proprietary information including AbbVie Trade Secrets, to develop and execute Alvotech's manufacturing process for AVT02.  Further, the Excel spreadsheets Mr. Ho took by intentionally

23

subverting AbbVie's security systems provided him with highly confidential and proprietary AbbVie Trade Secrets that, by definition, would aid or assist Alvotech in developing and executing Alvotech's manufacturing process for AVT02.

64. Alvotech knew or had reason to know that the AbbVie Trade Secrets were acquired by improper means, including at least through Mr. Ho. Specifically, by way of at least Mr. Ho's acts in furtherance of his employment for Alvotech, Alvotech acquired and then disclosed and/or used AbbVie's Trade Secrets without express or implied consent by AbbVie, and Alvotech knew or had reason to know that the AbbVie Trade Secrets were derived from or through a person who had used improper means to acquire the AbbVie Trade Secrets, acquired under circumstances giving rise to a duty to maintain the secrecy of the AbbVie Trade Secrets or limit the use of the AbbVie Trade Secrets, and/or derived from or through a person who owed a duty to AbbVie to maintain the secrecy of the AbbVie Trade Secrets or limit the use of the AbbVie Trade Secrets. Alvotech's decision to specifically target and hire a manufacturing leader who specialized in the manufacturing process for the exact antibody it was looking to copy cannot be explained by mere chance or coincidence. Alvotech sought out Mr. Ho based on his access to AbbVie Trade Secrets, particularly those relating to adalimumab manufacturing. This is further confirmed by its decision to also target and hire additional AbbVie employees.

## F. Alvotech Misappropriated AbbVie's Confidential and Proprietary Trade Secrets

65. Alvotech misappropriated AbbVie's Trade Secrets to gain technology and know-how to commercially manufacture a consistent, high-quality, cost-effective biosimilar product to AbbVie's HUMIRA®.

66.     Alvotech was a relative latecomer to the biologics industry, formed only in 2013.[11] It later announced its mission to provide follow-on biosimilar versions of certain monoclonal antibodies.[12]  While Alvotech set ambitious goals and timelines, its founder and chief investor, Robert Wessman, became painfully aware of the complexities involved in manufacturing biosimilar products.  The time, effort, investment, and resources required to develop a commercial manufacturing process for a biosimilar adalimumab proved difficult, as demonstrated by a series of delays and changes in management.

67.     Missed timelines and continuous changes in management took their toll.  Alvotech fell behind and competitors began beating it to the market.  Starting in 2015, applicants began submitting aBLAs for adalimumab, *i.e.*, biosimilars of AbbVie's HUMIRA®.[13]  And starting in September, 2016, the FDA has approved six.[14]

---

[11] Wessman, Robert, *The Story of Alvogen and the founding of a pharma empire*, World Finance: The Voice of the Market (Jan. 22, 2018), *available at* https://www.worldfinance.com/markets/ the-story-of-alvogen-and-the-founding-of-a-pharma-empire (last visited Feb. 19, 2021) ("Alvogen has also ventured into the biosimilars space via its sister company Alvotech, which was founded by Wessman in 2013.")

[12] *Alvotech invests $250 million in Biopharmaceuticals*, Alvotech Newsroom Post (Mar. 5, 2013), *available at* https://www.alvotech.com/newsroom/alvotech-and-finesse-collaborate (last visited Mar. 3, 2021).

[13]  FDA BLA Approval Letter, Amgen, Inc., BLA 761024, *available at* https://www. accessdata.fda.gov/drugsatfda_docs/appletter/2016/761024Orig1s000ltr.pdf (last visited mar. 3, 2021); FDA BLA Approval Letter, Boehringer Ingelheim Pharmaceuticals, Inc., BLA 761058, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/ 761058Orig1s000ltr.pdf (last visited Mar. 3, 2021); FDA BLA Approval Letter, Sandoz Inc., BLA 761071, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/ 761071Orig1s000ltr.pdf (last visited Mar. 3, 2021); FDA BLA Approval Letter, Samsun Bioepis Co., Ltd., BLA 761059, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/ 2019/761059Orig1s000ltr.pdf (last visited Mar. 3, 2021); FDA BLA Approval Letter, Pfizer, Inc., BLA 761118, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/ 761118Orig1s000ltr.pdf (last visited Mar. 3, 2021); FDA BLA Approval Letter, Mylan Pharmaceuticals Inc., BLA 761154, *available at* https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2020/761154Orig1s000ltr.pdf (last visited Mar. 3, 2021).

[14] *Id.*

| Biosimilar Competitor | aBLA Submitted | aBLA Approved |
|---|---|---|
| Amgen Inc. | November 25, 2015 | September 23, 2016 |
| Boehringer Ingelheim Pharmaceuticals, Inc. | October 27, 2016 | August 25, 2017 |
| Sandoz Inc. | October 30, 2017 | October 30, 2018 |
| Samsung Bioepis Co., Ltd. | July 23, 2018 | July 23, 2019 |
| Pfizer, Inc. | November 16, 2018 | November 15, 2019 |
| Mylan Pharmaceuticals Inc. | July 12, 2019 | July 6, 2020 |

68.     Alvotech began working with an external recruiter, Ayesah Khanon of Ark Talent Group, Head of European Life Sciences & Corporate Accounts, to seek out those with experience in the field of biosimilars.[15]  Ms. Khanon sought out AbbVie's Mr. Ho on behalf of Alvotech. According to Ms. Khanon, Mr. Ho "performed really well at the interview and was offered the role straight away."[16]  Between Alvotech's immediate offer of employment and Mr. Ho's departure from AbbVie several weeks later, Mr. Ho had ample access to AbbVie Trade Secrets that were advantageous to both Mr. Ho in his new role and Alvotech on its path to commercial adalimumab production.

69.     Alvotech welcomed Mr. Ho, and his Alvotech responsibilities mirrored those skills and know-how he obtained through the highly specialized training and restricted access he received at AbbVie.  For example, at both AbbVie and Alvotech, Mr. Ho was responsible for maintaining batch consistency, ensuring cell banking, preparing campaign summary reports, and audit readiness.

70.     Alvotech experienced difficulties with implementing MES because it was its partner's, Finesse, first attempt to transition from a lab scale to a full manufacturing execution.

---

[15] *See* https://www.arktalent.co.uk/meet-the-team/ (last visited Mar. 8, 2021).
[16] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021) (see Recommendation Received from Ayesha Khanon on April 13, 2018 and Recommendation Given to Ayesha Khanon on April 12, 2018).

Mr. Ho, however, touts his MES skills developed at AbbVie on his LinkedIn profile.[17] While at AbbVie, he was involved with commissioning and qualification activities in the start-up phase, engineering runs, and process validation, including authoring Standard Operating Procedures for AbbVie's HUMIRA® upstream manufacturing process.[18] Mr. Ho was involved in similar steps of manufacturing at Alvotech, including working with Alvotech's media/buffer prep, single-use mixer system, fed-batch cell culture, and single-use Bioreactor system, and albeit unbeknownst to AbbVie, he was working on the manufacturing process for a copycat of HUMIRA®.[19] Alvotech hired Mr. Ho "straight away," as it knew or had reason to know that he had AbbVie confidential information, know-how, and other AbbVie Trade Secrets uniquely-suited to helping make up time lost by Alvotech's delayed manufacturing project.

71. After Alvotech hired Mr. Ho, on July 9, 2018, Alvotech publicly announced its interest in developing an adalimumab biosimilar product.[20] A co-worker in the same group at Alvotech, Arunas Maisaitis, posted a recommendation on Mr. Ho's LinkedIn profile, stating he was "impressed by Rongzan['s][sic] problem solving attitude - Believe it. Achieve it . . . ."[21]

---

[17] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021).

[18] *Id*.

[19] *Id.*.

[20] ClinicalTrials.gov NCT03579823, "Comparative Safety, Tolerability, Pharmacokinetic Study of AVT02 (100MG/ML) and Humira (100MG/ML) in Healthy Volunteers (ALVOPAD)," *available at* https://www.clinicaltrials.gov/ct2/show/NCT03579823?term=Alvotech&draw= 2&rank=3 (last visited Feb. 24, 2021) (identifying "First Posted: July 9, 2018" and "Sponsor: Alvotech Swiss SG").

[21] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021) (see Recommendation Received from Arunas Maisaitis on July 23, 2018).

72.     Mr. Ho's work at Alvotech through December 2018 also included "Technology Transfer" where he authored technology transfer standard operating procedures.[22]  This again was very similar to his work at AbbVie, where he authored Standard Operating Procedures in, for example, the inoculation and fermentation areas, including operating bioreactors, adjusting equipment operation, performing process sampling and routine measurements, and documentation review.  Once again, unbeknownst to AbbVie, such work was performed by Mr. Ho on Alvotech's copycat drug.

73.     Approximately six months after Mr. Ho started at Alvotech, Alvotech's Iceland manufacturing facility received its manufacturing licensure from the Icelandic Medicines Agency.[23]

74.     Two days later, on September 27, 2018, Alvotech announced that "it was entering into a joint venture with Changchun High & New Technology Industries Group Inc. which will enable Alvotech to develop, manufacture and commercialize its biosimilar portfolio in China."[24]  The joint venture would include "[a] new state-of-the-art biologics facility built in China."[25]  The construction of a new biologics manufacturing facility in China would require further use of manufacturing know-how.

---

[22]  Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021).

[23] *Alvotech receives manufacturing license for its Biopharmaceutical facility*, Alvotech Newsroom Post (Sept. 25, 2018), *available at* https://www.alvotech.com/newsroom/alvotech-receives-manufacturing-license-for-its-biopharmaceutical (last visited Feb. 19, 2021).

[24] *Alvotech and Changchun High & New Technology Industries enter into agreement*, Alvotech Newsroom Post (Sept. 27, 2018), *available at* https://www.alvotech.com/newsroom/alvotech-and-changchun-high--new-technology-industries (last visited Feb. 24, 2021).

[25] *Id.*

75. In January 2019, less than one year after starting at Alvotech, Mr. Ho changed roles from a Scientist/DSM-USP Specialist (Level III, Expert)[26] to Manager, DSM-USP Manufacturing.[27]

76. As an Alvotech Manager, Mr. Ho led "an expanding team of 15 highly skilled direct reports in the full suite of Upstream Processing (USP) activities in Drug Substance Manufacturing (DSM), including media/feeds preparation, cell banking, cell revival and inoculation preparation (seed train expansion from cell back to shake flask) to rocker and single-use bioreactors, and harvest for fed-batch mode, as well as ATF perfusion bioreactor for continuous mode, for both internal and external (CMO) projects."[28]

77. In that role, Mr. Ho was "responsible for related senior management activities," including at least:

    a.    FTE requisition and hiring;

    b.    CMO business/clientele due diligence, i.e., facility fit assessment, equipment readiness, material sourcing, FMECA and risk mitigation, high level batch and supply planning, operations and staff performance management;

    c.    Policy-crafting and compliance;

    d.    Audits and inspections;

    e.    Cross-functional matrix teamwork;

    f.    Technology transfer;

    g.    Process validation (JMP);

    h.    OPEX and CAPEX planning and projects such as forecasting and procurement of consumables, and vendor/equipment selection, design,

---

[26] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021).

[27] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021).

[28] *Id.*

integration till implementation of single-use in-process monitoring probes (pH, biomass capacitance), ATF10 perfusion system and Manufacturing Execution System (Werum PAS-X); and

i. Operational excellence – continuous improvements for streamlining processes/workflows and enhancing EHS, as well as cost, waste, error and risk reduction initiatives, etc.[29]

78. Notably, Mr. Ho obtained AbbVie Trade Secrets and confidential information relating to the above-listed subject matter through his work at AbbVie Singapore and he had access to documents containing confidential information including AbbVie Trade Secrets. For example, Mr. Ho's work at AbbVie Singapore involved extensive supply planning and access to related documents to ensure completion of each step of the upstream manufacturing process and progression to the next step. Mr. Ho's work at AbbVie also involved training other biotechnologists and qualifying them to execute upstream manufacturing tasks. Further, he had access to standard operating procedures and other documentation while at AbbVie Singapore and learned and had access to documents to coordinate commissioning and qualification activities necessary for bringing the manufacturing facility at AbbVie Singapore online. He also conducted trial, development, and engineering process runs and validated the process, and he had access to related documents. Mr. Ho gained an understanding of and had access to documents describing AbbVie's inventory of non-bill of materials laboratory consumables, including about how much is consumed per process run. He also was qualified to execute, and was certified to train other biotechnologists to execute, operation of various process equipment, including in-process monitoring probes, and access to related training materials. Thus, the majority of Mr. Ho's work at Alvotech fell squarely within the scope of his work at AbbVie, and at least based on Rongzan Ho's wrongful acts within the scope of his employment for Alvotech, Alvotech knew or had reason

---

[29] *Id.*

to know that Mr. Ho would use AbbVie's Trade Secrets, confidential information and know-how in his work for Alvotech.

79.     While employed at Alvotech, Mr. Ho touted his expertise and experience in working on AbbVie's citrate-free formulation in his speaker biography where he noted that he was involved in the startup of AbbVie's Singapore facility "for Citrate-Free Adalimumab," connecting his prior AbbVie work to his work at Alvotech.[30]

80.     On February 25, 2019, Alvotech announced that it met with the Changchun High & New Technology Industries Group Inc. to discuss the groundbreaking of the new state-of-the-art biopharmaceutical manufacturing facility in Changchun that was part of their joint venture announced in late 2018.[31]  The construction of the China manufacturing facility threatens further misuse and distribution of AbbVie confidential information, including AbbVie's Trade Secrets.

81.     On March 24, 2020, Alvotech stated that it would file for approval of AVT02 in the U.S. in the second half of 2020.[32]  The announcement explained that AVT02 is a biosimilar monoclonal antibody to AbbVie's HUMIRA®.  This application was made in the United States, and, once approved, will be used to manufacture products sold throughout the United States including in this District, unfairly and irreparably harming AbbVie including in this District.

82.     In order to seek and then receive approval for its aBLA, Alvotech needed, among other items, a registered manufacturing facility compliant with the FDA's good manufacturing

---

[30] Biologics Manufacturing Nordics 2020 Conference, Rongzan Ho speaker profile, *available at* https://www.imapac.com/en/business_conferences/biologics-world-nordic/?lists=speakers   (last visited Mar. 4, 2021) (select "view details" for Mr. Ho Alvotech).

[31] *Work begins on Alvotech-CCHN joint venture*, Alvotech Newsroom Post (Feb. 25, 2019), *available at* https://www.alvotech.com/newsroom/work-begins-on-alvotech-cchn-joint-venture-in-china (last visited Feb. 24, 2021).

[32] *Alvotech and DKSH partner to bring key biosimilar to Asia*, Alvotech Newsroom Post (Mar. 24, 2020), *available at* https://www.alvotech.com/newsroom/alvotech-and-dksh-partner-to-bring-key-biosimilar-to (last visited Feb. 24, 2021).

practice regulations. When submitting an aBLA,[33] the applicant must identify the establishment that will be manufacturing the product, the manufacturing steps and/or type of testing, and the establishment's Registration (FEI) Number, MF Number, and DUNS Number.[34] The application must also identify when the manufacturing site will be ready for inspection.[35] Manufacturing information is provided as part of the application[36] and the applicant must certify that it will comply with all applicable laws and regulations that apply to approved applications, including but not limited to, . . . [g]ood manufacturing practice regulations . . . .".[37] All of the manufacturing training and know how that Mr. Ho received from AbbVie, which was provided to him through a considerable investment of time and financial resources by AbbVie, helped Alvotech meet at least these requirements, allowing Alvotech to seek approval of its aBLA in the United States.

83. Alvotech has attempted to overcome its late entry into biosimilars development by obtaining AbbVie's Trade Secrets and also its continued recruitment efforts targeting AbbVie employees with in-depth expertise in HUMIRA® manufacturing in order to use their knowledge, gained from experience working with and training based on AbbVie's Trade Secret information, to improperly speed along the commissioning process of their new manufacturing facility. Alvotech went so far as to include a video featuring Mr. Ho on its recruitment webpage and posted on LinkedIn by founder Robert Wessman approximately one year ago, where Mr. Ho touted

---

[33] FDA, *Biologics License Applications (BLA) Process (CBER)*, *available at* https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-process-cber (last visited Feb. 24, 2021).

[34] *See* Form FDA 356h; *see also* Guidance for Industry Providing Regulatory Submissions in Electronic Format – Drug Establishment Registration and Drug Listing (available at https://www.fda.gov/media/71146/download).

[35] *See* Form FDA 356h.

[36] *See* Form FDA 356h (listing application content of "Chemistry, manufacturing, and controls information *(e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2)*").

[37] *See* Form FDA 356h (Certification section).

Alvotech as an ideal place of employment with a prominent display of Mr. Ho's name, and his role as a Team Leader.[38]

84.     After Mr. Ho, at least two more AbbVie employees were recruited by Alvotech and left AbbVie for work in Iceland to assist with commissioning in May 2020.  A recruiter reached out on behalf of Alvotech to one or more AbbVie employees and specifically inquired about work on Alvotech's biosimilar to AbbVie's HUMIRA® as part of the job description.

85.     Then, in July 2020, with the manufacturing license secured and Alvotech's aBLA ready for filing, Mr. Ho left Alvotech.[39]

86.     Shortly after Mr. Ho's departure, on November 19, 2020, Alvotech announced that the FDA has accepted its regulatory submission for AVT02 for review.[40]  The announcement explained that AVT02 is one of five product candidates from Alvotech that will be commercialized, upon approval, in the U.S.[41]  Alvotech previously announced, on August 5, 2020, that its strategic partnership with Teva Pharmaceuticals Industries Ltd. would allow it "to secure *a leading position* in the U.S. biosimilar market."[42]  Alvotech's founder and Chairman, Robert

---

[38] Alvotech Iceland Website, Rongzan Ho Video Link, https://storf.alvotech.is/ (last viewed Feb. 25, 2021); Andrew Falconbridge LinkedIn Activity, *available at* https://www.linkedin.com/in/andrew-falconbridge-56665323/detail/recent-activity/ (post in activity history by Andrew Falconbridge, VP of Process Technology & Innovation at Alvotech, sharing a post by Robert Wessman, Chairman & Founder of Alvotech, labeled as one year ago with the message "At Alvotech, we have a talented team with a clear vision. Our employees are proud to be part of a diverse cultural team who are striving for excellence every day. #proudtobe #excellence #striving #diverse #talented #cultural").

[39] Rongzan Ho LinkedIn Profile, *available at* https://www.linkedin.com/in/rongzan/?original Subdomain=is (last visited Feb. 18, 2021). .

[40] *Alvotech announces that the U.S. FDA and EMA have accepted regulatory submissions for AVT02, a proposed biosimilar to Humira® (adalimumab)*, Alvotech Newsroom Post (Nov. 19, 2020), *available at* https://www.alvotech.com/newsroom/alvotech-announces-that-the-u.s.-fda-and-ema-have-accepted (last visited Feb. 19, 2021).

[41] *Id.*

[42] *Alvotech and Teva announce strategic partnership to collaborate in the U.S. biosimilar market*, Alvotech Newsroom Post (Aug. 5, 2020), *available at* https://www.alvotech.com/

Wessman, declared that the strategic alliance would "accelerate the introduction and adoption of new biosimilar medicines for patients in the U.S. market."[43] Alvotech is "responsible for the development, registration and supply of the biosimilars" under the partnership agreement and will "share profit from the commercialization of the biosimilars."[44]

87.  Despite this announcement, Alvotech was late to the biosimilars development process as other biosimilar versions of HUMIRA® had already gained FDA approval.  These earlier filed biosimilar competitors had copied the 50 mg/mL dosage form.  Alvotech took a different route.  In a 2021 article, Mr. Wessman explained how Alvotech monitored and sought to replicate AbbVie's advances, switching gears from a 50mg adalimumab product to a 100mg high-concentration product as soon as Alvotech "heard that AbbVie was getting ready to launch 100mg," noting that Alvotech "did not even consider 50mg any more" despite being in the process of developing a 50mg product.[45]  Thus, Alvotech sought FDA-approval for a high-concentration 100 mg/mL adalimumab dosage form—the same concentration manufactured at AbbVie's Singapore facility by Mr. Ho.[46]  Alvotech stated that "AVT02 contains a high concentration (100

<hr>

newsroom/alvotech-and-teva-announce-strategic-partnership-to (last visited Feb. 24, 2021) (emphasis added).
[43] *Id.*
[44] *Id.*
[45] Wallace, David, "Celltrion Wins Global First Approval For High-Concentration Humira Biosimilar" *Generics Bulletin* (Feb. 15, 2021).
[46] *Alvotech announces that the U.S. FDA and EMA have accepted regulatory submissions for AVT02, a proposed biosimilar to Humira® (adalimumab)*, Alvotech Newsroom Post (Nov. 19, 2020), *available at* https://www.alvotech.com/newsroom/alvotech-announces-that-the-u.s.-fda-and-ema-have-accepted (last visited Feb. 19, 2021); *see also Alvotech completes enrollment of phase III study involving biosimilar version of Humira®*, Alvotech Newsroom Post (July 15, 2019), *available at* https://www.alvotech.com/newsroom/alvotech-completes-enrollment-of-phase-iii-study-involving (last viewed Feb. 19, 2021).

mg/ml) formulation, which is expected to be more convenient for patients. With AVT02, Alvotech is well positioned to differentiate itself from other biosimilars in the market."[47]

88.     The rest of the products in Alvotech's "pipeline" are still years out. Alvotech's website is void of any announcements regarding an aBLA submission other than AbbVie's HUMIRA® product.[48] Indeed, in a recent 2021 interview, Alvotech's Chief Commercial Officer acknowledged that Alvotech is at least five years out before many of its purported products will even complete the R&D phase.[49] In fact, other than the six clinical trials related to adalimumab, only a single Phase 1 clinical trial for another product (a comparison of Alvotech's AVT04 to STELARA® (ustekinumab)) lists Alvotech as the sponsor on the ClinicalTrials.gov website.[50] The status of this Phase 1 study is telling of the very early clinical stage that Alvotech's "next" product is in.[51] It was first posted on February 9 of this year, is not yet recruiting, and has an estimated study completion date of mid-2022 that is based on a study start date of less than a month from now on April 1, 2021.[52] Only if Alvotech successfully completes this initial and any further Phase 1 studies will it be able to even *begin* Phase 3 clinical trials.

---

[47] *Alvotech completes enrollment of phase III study involving biosimilar version of Humira®*, Alvotech Newsroom Post (July 15, 2019), *available at* https://www.alvotech.com/newsroom/alvotech-completes-enrollment-of-phase-iii-study-involving (last viewed Feb. 19, 2021).

[48] *See* Alvotech Newsroom, *available at* https://www.alvotech.com/newsroom (last visited Mar. 8, 2021).

[49] Interview of Anil Okay—General Manager, Adalvo & Chief Commercial Officer, Alvotech, Pharmaboardroom.com, *available at* https://pharmaboardroom.com/interviews/anil-okay-general-manager-adalvo-chief-commercial-officer-alvotech/ (last visited Mar. 3, 2021).

[50] Search results for "Alvotech" on ClinicalTrials.gov, *available at* https://clinicaltrials.gov/ct2/results?recrs=&cond=&term=alvotech&cntry=&state=&city=&dist= (last visited Mar. 3, 2021).

[51] ClinicalTrials.gov NCT04744363, "Pharmacokinetics, Safety and Tolerability Study of AVT04 to EU Approved and US Licensed Stelara (Ustekinumab)," *available at* https://clinicaltrials.gov/ct2/show/NCT04744363?term=alvotech&draw=2&rank=2 (last visited Mar. 3, 2021).

[52] *Id.*

89.     Needing a "first" product to bring to market and hoping to make up for lost time, Alvotech found an AbbVie employee who it knew would be able to help Alvotech skip ahead of its competitors to the front of the line with a high-concentration product.  Alvotech knew that Mr. Ho worked on manufacturing a high-concentration product at AbbVie.  Accordingly, Alvotech not only installed Mr. Ho in a supervisory role overseeing upstream manufacturing (exactly what he did at AbbVie) and tasked him to perform that role for a biosimilar of the exact same drug he worked on while at AbbVie, but also tasked him with manufacturing the exact same dosage as he manufactured at AbbVie—an admitted specialized dosage that Alvotech believed differentiates it from other companies in the market.  Alvotech could not have independently developed its adalimumab biosimilar commercial manufacturing facility and manufacturing process, particularly in the timeframe in which it did so, without the wrongful acquisition and use of AbbVie's Trade Secrets. Instead, Alvotech chose to misappropriate AbbVie's Trade Secrets through Mr. Ho, and recruit other former AbbVie employees, in order to commercially manufacture its adalimumab biosimilar product.

## COUNT I

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**(18 U.S.C. §§ 1836(b), 1839 *et seq*.)**

90.     AbbVie incorporates and re-alleges each and every allegation above as if fully set forth herein.

91.     AbbVie is the owner of certain valuable trade secrets relating to the manufacture of HUMIRA®, including AbbVie Trade Secrets.  These trade secrets are related to AbbVie's HUMIRA® product that is used in or intended for use in interstate and foreign commerce.  These

confidential and proprietary trade secrets are of substantial, independent economic value and have conferred a competitive advantage on AbbVie.

92.     AbbVie's Trade Secrets are not publicly known and are not readily ascertainable.

93.     As stated above, Alvotech has submitted its aBLA for AVT02, a HUMIRA® biosimilar product, to the FDA in the United States. Additionally, Alvotech intends to market and sell AVT02 throughout the United States.

94.     Former AbbVie employees including Mr. Ho gained access to AbbVie's confidential and proprietary trade secrets in the course of an employee-employer relationship with AbbVie. AbbVie employee Mr. Ho—and by extension, Alvotech, for which he assumed a senior position and in the course and scope of that position—acquired and retained AbbVie's confidential and proprietary trade secrets including after departing from AbbVie. Such acquisition and retention of AbbVie's confidential and proprietary trade secrets was improper, a breach of confidential relationships with AbbVie, and a breach of Mr. Ho's duties and obligations to maintain the secrecy of AbbVie's confidential and proprietary information.

95.     In furtherance of its illegal scheme, Alvotech hired AbbVie employees including Mr. Ho.

96.     Contrary to Mr. Ho's representations in connection with his departure from AbbVie, it turns out that Alvotech, AbbVie's direct competitor, deployed Mr. Ho in the exact same role he performed at AbbVie—complex upstream manufacturing for biologics—and tasked Mr. Ho with developing and overseeing the upstream manufacturing for the exact same drug that he was responsible for at AbbVie—AVT02, a high-concentration (100 mg/mL) HUMIRA® biosimilar. AbbVie is unaware of any actions Alvotech took to prevent Rongzan Ho from using or disclosing AbbVie's trade secrets; to the contrary, Alvotech placed him in the exact same role,

working with a biosimilar of the exact same antibody, as he had held immediately beforehand at AbbVie. Alvotech also hired other former AbbVie employees that had access to some similar information as Mr. Ho.

97.     Former AbbVie employees including Mr. Ho subsequently used and disclosed in connection with and within the scope of their employment by Alvotech AbbVie's confidential and proprietary trade secrets.  Accordingly, Alvotech, through at least the actions of Mr. Ho within the course and scope of his employment for Alvotech, has possessed and used the foregoing AbbVie confidential and proprietary trade secrets, which are subject to confidentiality agreements in which AbbVie employees including Mr. Ho expressly acknowledged and confirmed the confidential and proprietary nature of these trade secrets.

98.     Alvotech improperly acquired AbbVie's confidential and proprietary trade secrets through Mr. Ho, as well as recruited other AbbVie employees, as alleged above, and has since continued to improperly and without authorization use those AbbVie trade secrets, including by using them to achieve a viable manufacturing process, and using them to manufacture its biosimilar adalimumab product.

99.     Alvotech acquired, disclosed, and used AbbVie Trade Secrets despite that it knew or had reason to know that the trade secrets were (1) acquired by improper means; and/or (2) derived through a person who used improper means to acquire the trade secrets; and/or (3) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or (4) derived from or through a person who owed a duty to AbbVie to maintain the secrecy of the trade secret or limit the use of the trade secret.

100.     Alvotech has misappropriated AbbVie's confidential and proprietary trade secrets by acquiring, using, and/or disclosing AbbVie Trade Secrets, including by developing a

manufacturing process, and manufacturing products. Alvotech committed numerous acts in furtherance of this misappropriation in the United States, including by misappropriating trade secrets that originated in the United States, through means located in the United States, and by filing the aforementioned aBLA in the United States to produce products to be sold throughout the United States.

101.    Alvotech willfully and maliciously misappropriated AbbVie's trade secrets in order to gain economic value from that information.

102.    AbbVie had taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring those who access AbbVie's trade secrets, sign confidentiality and/or nondisclosure agreements.

103.    As a direct and proximate result of Alvotech's current and continued misappropriation of AbbVie's trade secrets, AbbVie will suffer imminent and irreparable harm.

104.    Unless enjoined by this Court, Alvotech's acts of misappropriation will continue and AbbVie will suffer irreparable harm.

105.    AbbVie has no adequate remedy at law.

## COUNT II

**Trade Secret Misappropriation Under the Illinois Trade Secrets Act**

**(765 ILCS 1065 *et seq*.)**

106.    AbbVie incorporates and re-alleges each and every allegation above as if fully set forth herein.

107.    AbbVie is the owner of certain valuable trade secrets relating to the manufacture of HUMIRA®, including AbbVie Trade Secrets. These confidential and proprietary trade secrets are

of substantial, independent economic value and have conferred a competitive advantage on AbbVie.

108.    AbbVie's trade secrets are not publicly known and are not readily ascertainable.

109.    As stated above, Alvotech has submitted its aBLA for AVT02, a HUMIRA® biosimilar product, to the FDA in the United States.  Additionally, Alvotech intends to market and sell AVT02 throughout the United States, including in Illinois.

110.    Former AbbVie employees including Mr. Ho gained access to AbbVie's confidential and proprietary trade secrets in the course of an employee-employer relationship with AbbVie. AbbVie employee Mr. Ho—and by extension, Alvotech— acquired and retained AbbVie's confidential and proprietary trade secrets including after departing AbbVie.  Such acquisition and retention of AbbVie's confidential and proprietary trade secrets was improper and a breach of confidential relationships with AbbVie and duties to maintain the secrecy of AbbVie's confidential and proprietary information.

111.    In furtherance of its illegal scheme, Alvotech hired AbbVie employees including Mr. Ho.

112.    Contrary to Mr. Ho's representations in connection with his departure from AbbVie, it turns out that Alvotech, AbbVie's direct competitor, deployed Mr. Ho in the exact same role he performed at AbbVie—complex upstream manufacturing for biologics—and tasked Mr. Ho with developing and overseeing the upstream manufacturing for the exact same drug that he was responsible for at AbbVie—AVT02, a high-concentration (100 mg/mL) HUMIRA® biosimilar.  AbbVie is unaware of any actions Alvotech took to prevent Mr. Ho from using or disclosing AbbVie's trade secrets; to the contrary, Alvotech placed him in the exact same role, working with the exact same antibody, as he had held immediately beforehand at AbbVie.

Alvotech also hired other former AbbVie employees that had access to some similar information as Mr. Ho.

113.     Former AbbVie employees, including Mr. Ho, subsequently used and disclosed in connection with and within the scope of their employment by Alvotech AbbVie's confidential and proprietary trade secrets.  Accordingly, Alvotech, through at least the actions of Mr. Ho within the course and scope of his employment for Alvotech, has possessed the foregoing AbbVie confidential and proprietary trade secrets, which are subject to confidentiality agreements in which AbbVie employees including Mr. Ho expressly acknowledged and confirmed the confidential and proprietary nature of these trade secrets.

114.     Alvotech improperly acquired AbbVie's confidential and proprietary trade secrets through Mr. Ho, as well as recruited other AbbVie employees, as alleged above, and has since continued to improperly and without authorization use those AbbVie trade secrets, including by using them to achieve a viable manufacturing process, and using them to manufacture its biosimilar adalimumab product.

115.     Alvotech acquired, disclosed, and used AbbVie Trade Secrets despite knowing or having had a reason to know that the trade secrets were (1) acquired by improper means; and/or (2) derived through a person who used improper means to acquire the trade secrets; and/or (3) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or (4) derived from or through a person who owed a duty to AbbVie to maintain the secrecy of the trade secret or limit the use of the trade secret.

116.     Alvotech has misappropriated AbbVie's confidential and proprietary trade secrets by acquiring, using, and/or disclosing AbbVie Trade Secrets, including by developing a manufacturing process and manufacturing products.  Alvotech committed numerous acts in

41

furtherance of this misappropriation in the United States, including by misappropriating trade secrets that originated in the United States, through means located in the United States, and by filing the aforementioned aBLA in the United States to produce products to be sold throughout the United States, including in Illinois.

117.    Alvotech willfully and maliciously misappropriated AbbVie's trade secrets in order to gain economic value from that information.

118.    AbbVie has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to AbbVie's trade secrets.

119.    As a direct and proximate result of Alvotech's current and continued misappropriation of AbbVie's trade secrets, AbbVie will suffer imminent and irreparable harm in Illinois.

120.    Unless enjoined by this Court, Alvotech's acts of misappropriation will continue and AbbVie will suffer irreparable harm.

121.    AbbVie has no adequate remedy at law.

## **JURY DEMAND**

AbbVie requests trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, AbbVie respectfully requests the following relief:

1.    Judgment in favor of AbbVie and against Alvotech on each cause of action alleged herein.

2.    Declare that Alvotech has no rights or privileges to use AbbVie's trade secrets.

3.    Award a temporary restraining order, preliminary and/or permanent injunctive relief pursuant to which Alvotech and all affiliates, employees, agents, officers, directors, attorneys,

successors, and assigns, and all those acting on behalf of or in active concert or participation with

any of them are ordered, enjoined, or restrained, directly or indirectly, anywhere in the world, by

any means whatsoever as follows:

    a.    From possessing, disclosing and/or using AbbVie Trade Secrets;

    b.    From making, testing, using, promoting, offering to sell, marketing, commercializing, or selling biosimilars, therapeutics, drugs, and/or products of any kind that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any AbbVie Trade Secrets;

    c.    From utilizing any processes or methods that are derived from, contain, utilize, embody, or were developed, in whole or in part, with the benefit or use of any AbbVie Trade Secrets;

    d.    From submitting or filing with any regulatory body any documents or other materials (in paper, electronic, or any other form, including for example, cell lines, assays, or drug substances) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any AbbVie Trade Secrets;

    e.    Immediately to preserve and prevent from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories;

    f.    Immediately to catalog, quarantine, and return to AbbVie (i) all AbbVie Trade Secrets and (ii) all copies of all documents, information, and materials (in paper, electronic, or any other form, including, for example, cell lines, assays, or drug substances) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any AbbVie Trade Secrets;

    g.    To identify each individual and entity to whom or to which Alvotech and its employees and representatives, and all persons acting in concert or participating with them, disclosed (i) any AbbVie Trade Secrets and (ii) any documents, information, and materials (in paper, electronic, or any other form, including, for example, cell lines, assays, or drug substances) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any AbbVie Trade Secrets;

    h.    To turn over to the Court any proceeds Alvotech has received from the misappropriation of AbbVie Trade Secrets, which proceeds would be held in constructive trust until the conclusion of this litigation; and

i. Cease and desist from its efforts to encourage employees and others, including from violating AbbVie's intellectual property rights relating to its confidential and proprietary information

4. Award AbbVie damages for the actual loss, unjust enrichment, and/or a reasonable royalty due to the misappropriation, and any and all other damages that may be awarded.

5. Award AbbVie exemplary damages pursuant to 18 U.S.C. § 1836 *et seq.* and 765 ILCS 1065/1 *et seq*.

6. Award AbbVie punitive damages in an amount to be determined at trial.

7. Award AbbVie attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 *et seq.* and 765 ILCS 1065/1 *et seq.*

8. Award AbbVie pre-judgment and post-judgment interest.

9. Award AbbVie attorneys' fees, costs, and expenses incurred by AbbVie in investigating this misconduct and litigating this action.

10. Award AbbVie any such other relief as the Court deems appropriate.

Date:  March 19, 2021

Respectfully submitted

*/s/ Sean M. Berkowitz*

Sean M. Berkowitz (ARDC No. 6209701)
*sean.berkowitz@lw.com*
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Douglas E. Lumish (*pro hac vice* forthcoming)
*doug.lumish@lw.com*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600

Jennifer H. Roscetti (*pro hac vice* forthcoming)
*jennifer.roscetti@finnegan.com*
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone: (202) 408-4150
Facsimile: (202) 408-4400